GEOFFREY HANSEN
Acting Federal Public Defender
Northern District of California
GRAHAM ARCHER
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:  (510) 637-3500
Facsimile:  (510) 637-3507
Email:   Graham_Archer@fd.org

Counsel for Defendant Guardado

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 21–00241 JSW |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM; MOTION FOR VARIANCE** |
| v. | |
| ADALBERTO GUARDADO, | **Court:** Courtroom 5, 2nd Floor |
| Defendant. | **Hearing Date:** February 22, 2022 |
| | **Hearing Time:** 9:30 a.m. |

## INTRODUCTION

Mr. Guardado will appear before the Court at age 68 for sentencing after pleading guilty to the sole count alleged in the Information, a violation of 18 U.S.C. § 2422(b).  Mr. Guardado's plea is pursuant to an agreement between the parties which jointly recommends 120 months imprisonment. Mr. Guardado acknowledges the seriousness of the offense and takes full responsibility for his actions.  As a result, he waived indictment and resolved his case quickly, preventing further trauma to the victim and her family, and preserving court resources. Mr. Guardado's conduct was very serious, but aberrant. He suffers from significant health issues that, combined with his age, are likely to curtail

his life expectancy, and he will be deported to El Salvador upon completion of his sentence. A sentence within the advisory guideline range would almost certainly result in Mr. Guardado's demise in prison. For the reasons set forth below, the defense joins the government in requesting that the Court impose a sentence of 120 months.

## BACKGROUND

Mr. Guardado was arrested for the offense conduct on September 14, 2019, and has remained in custody since. On April 23, 2021, Mr. Guardado made his initial appearance in federal court. Presentence Report ("PSR") ¶ 4. Mr. Guardado waived his right to a detention hearing, as well as his right to indictment, and agreed to proceed by way of information. *Id*, Docket No. 19. At the first status conference before this Court, Mr. Guardado requested a date for change of plea. On September 7, 2021, Mr. Guardado entered a guilty plea.

## GUIDELINE CALCULATION AND CRIMINAL HISTORY

Mr. Guardado agrees with the guideline calculation set forth by the parties in the plea agreement and by Probation the Presentence Report, which results in an adjusted offense level of 37. Mr. Guardado has no criminal history points, placing him in Criminal History Category I, and resulting in an advisory guideline range of 210-262 months.

Mr. Guardado has one prior criminal conviction, for misdemeanor domestic battery, sustained in 1997. Mr. Guardado has three arrests for drug possession from 2000-2002, during a time when he struggled with substance abuse. Mr. Guardado has no arrests or convictions for anything similar to the current offense conduct.

## ARGUMENT

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996) (quotations omitted)). Ultimately, the "overarching statutory charge for a district court is to 'impose a sentence sufficient but not greater

than necessary'" to reflect the factors detailed in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*) (quoting 18 U.S.C. § 3553(a)). The § 3553(a) factors assist the Court in fulfilling its mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).

Undoubtedly, Mr. Guardado's conduct in this case is extremely serious. He acknowledges so himself, and he quickly accepted responsibility. While he knows he cannot right the damage he has caused, he is extremely apologetic, and understands the gravity of his actions. Here, for the reasons set forth below, a sentence of 120 months is sufficient to satisfy the requirements set forth in 18 U.S.C. 3553(a).

## I. Mr. Guardado's personal circumstances, in particular his age and health, warrant a downward variance

Mr. Guardado was born in 1953 in San Salvador, El Salvador. PSR ¶ 49. His family was well-off, and Mr. Guardado's needs were met. While his father resorted to discipline which would qualify as physical abuse by today's standards, Mr. Guardado loved him dearly, stating that "my father was my greatest friend." PSR ¶ 51. Mr. Guardado's father passed away in 2002 of a heart attack. PSR ¶ 49. The comfortable life of Mr. Guardado's early childhood was violently upended when he was 10 years old. Soldiers came to his home looking for his father. They murdered Mr. Guardado's nanny and his uncle, and tortured and sexually abused Mr. Guardado and two of his siblings in an effort to find his father. PSR ¶ 53. Mr. Guardado and his siblings were rescued and hospitalized. PSR ¶ 54. As a result, the family fled El Salvador, traveling to Chile, Argentina, Peru, and Mexico for the next six to seven years. Ultimately, the family immigrated the United States in 1970, when Mr. Guardado was 17 years old, and Mr. Guardado has resided in the United States since. PSR ¶ 56.

Life in the United States was not without trauma for Mr. Guardado. While in high school, Mr. Guardado was shot in the arm by another student, and in 1976, Mr. Guardado was stabbed in the chest when he confronted someone who was stealing the stereo out of his car. The stabbing resulted in six weeks of hospitalization. PSR ¶ 55. Mr. Guardado went on to have three children, and now has seven grandchildren. PSR ¶ 56. Mr. Guardadado's daughter, Roxanna, described her father as

"extremely protective" of her when she was growing up, and noted that he was always working and playing music. PSR ¶ 61.

While Mr. Guardado entered the United States legally, he was subject to removal proceedings that were initiated in 2012 as a result of his misdemeanor domestic violence conviction. As a result of the current case, which qualifies as an aggravated felony, he will certainly be removed from the United States, barred for life, and returned to El Salvador, a country he has not lived in for 51 years.[1]

### A. Mr. Guardado's life expectancy is of similar length to the sentence recommended by the parties, and is well short of the sentence set forth by the advisory guidelines

Mr. Guardado suffers from significant health problems which, in combination with his incarceration, are likely to significantly shorten his life expectancy. Nationally, life expectancy in 2020 for Hispanic Males who have lived to the age of 65 is 18.7 years.[2] Mr. Guardado's health and circumstances make it unlikely that he will live that long. First, his incarceration itself results in a reduction in life expectancy. In "The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003," Dr. Evelyn Patterson concluded that each year in prison translated to a 2-year decline in life expectancy.[3]

Mr. Guardado's medical conditions are further indicator that a sentence beyond that recommended by the parties will likely result in his demise in prison. Mr. Guardado suffers from a litany of health problems: asthma, high blood pressure, pre-diabetes, heart attacks, bladder problems, rheumatoid arthritis and degenerative spinal issues from a car accident in 2000. PSR ¶¶ 64-65. Mr. Guardado also has significant dental issues, having lost a dental bridge when he was arrested, leaving him with only one tooth to chew with. PSR ¶ 66. He has requested dental care at Santa Rita to no avail, but he is hopeful that he can be moved to a federal prison soon after sentencing to receive the needed dental procedures.

Mr. Guardado's traumatic childhood further negatively affects his life expectancy. Adverse

---

[1] *See* 8 USC § 1101(a)(43)(A).
[2] National Center for Health Statistics: Provisional Life Expectancy Estimates for January through June, 2020, at p.2, *Arias, Tejada-Vera, Ahmad* (February, 2021) Available at https://www.cdc.gov/nchs/data/vsrr/VSRR10-508.pdf
[3] *The Dose-Response of Time Served in Prison on Mortality: New York State 1989-2003*, Dr. Evelyn Patterson, PhD, American Journal of Public Health (February 6, 2013).

DEFENDANT'S SENTENCING MEMORANDUM; MOTION FOR VARIANCE
*GUARDADO*, CR 21–00241 JSW

Childhood Experiences, or ACEs, result in both a reduction in life expectancy, as well as a reduction in quality-adjusted life expectancy.[4] Mr. Guardado experienced childhood familial physical abuse, as well as personal torture and sexual abuse at the hands of the military, which may serve to shorten his life expectancy.

Due to Mr. Guardado's age and health issues, the 120 month sentence recommended by the parties is sufficient, but not greater than necessary to achieve the sentencing goals set forth in Section 3553(a).

**II.    Mr. Guardado's conduct in this case is an aberration in the context of the rest of his life**

At age 68, this offense will define the rest of Mr. Guardado's life, but it is not reflective of how he lived the years prior. Mr. Guardado's youngest daughter expressed that she was "disgusted and shocked" when she learned about the offense, but noted that she was not aware of any red flags prior to this occurring. PSR ¶ 60. Indeed, Mr. Guardado's conduct has been a "huge blow" to the family, resulting in many of them participating in therapy to address his arrest and conduct. PSR ¶¶ 56, 60.

Consistent with his daughter's shock at what her father has done, there are no indications in Mr. Guardado's criminal history of any conduct similar to this. Mr. Guardado's phones were searched, and along with the offending video, only five other images were found. PSR ¶¶ 13, 15. In contrast to many other similarly situated defendants, Mr. Guardado did not distribute any child pornography, nor engage in any chatting behavior, nor possess a large collection of child pornography.

When confronted by officers, Mr. Guardado admitted that he had recorded the video, stating "I fucked up, I fucked up[,]" and that it was a "[s]tupid, stupid thing to do." PSR ¶ 11. Mr. Guardado immediately showed remorse, consistent with his later decision to waive indictment and plead guilty.

Mr. Guardado's conduct in September of 2019 was at odds with how he has lived the rest of his life – playing music professionally, and volunteering with a number of charities and social programs in San Francisco. PSR ¶ 57, 58. He was a dedicated father and grandfather, whose actions now have come as a surprise to his family. PSR ¶ 60.

---

[4] *See Adverse childhood experiences and the risk of premature mortality*, Brown, et. al, American Journal of Preventative Medicine (Nov. 2009); *Impact of adverse childhood experiences on quality-adjusted life expectancy in the U.S. population*. Jia and Lubetkin, Child Abuse and Neglect (April 2020).

### III. Mr. Guardado has engaged in post-offense rehabilitation in an effort to understand why he committed the offense

As discussed above, Mr. Guardado's actions in this case are out of character for him. He continues to work to understand why he did what he did. While opportunities for post-offense rehabilitation while in custody in local jails are severely limited, he has done what he can to avail himself of them. While housed at the Martinez Detention Facility, Mr. Guardado participated in any and all classes available to him. Beginning in July, 2020 and continuing through February of 2021, Mr. Guardado completed 20 modules of the Game Plan for Success distance learning program offered through the Contra Costa Adult School ("CCAS"). *See* Exhibit A – Certificates of Completion. Mr. Guardado also completed all three phases of the DEUCE program, which teaches skills to cope with substance abuse and anger and stress management, as well as parenting classes. *Id.* Finally, Mr. Guardado completed all three phases of the CCAS Commitment to Change program. His teacher described Mr. Guardado's performance as follows: "You are giving it your all and I can see by your carefully thought out responses that it means a lot to you. I am very proud of all that you are doing to change your thinking and your future! It shows!" *Id*. Mr. Guardado's efforts at introspection align with the aberrant nature of his offense conduct in this case.

Probation characterizes Mr. Guardado's wish to work with groups that deal with the abuse or trafficking of children as something which "may be indicative of his lack of understanding as to the seriousness of his offense and the need to protect the community." PSR Recommendation, p. 3. That is mistaken. Mr. Guardado is well aware of the seriousness of the offense conduct. His statement regarding volunteering was part of his effort to make amends for what he did, and is a reflection of his continued efforts at introspection in the wake of his actions.

### IV. Mr. Guardado Objects to Certain Proposed Supervised Release Conditions

Courts may impose supervised release conditions "if they are reasonably related to the goal of deterrence, protection of the public, or rehabilitation of the offender." *United States v. T.M.*, 330 F.3d 1235, 1239–40 (9th Cir. 2003) (citing 18 U.S.C. §§ 3583(d)(1) and 3553(a)). Conditions must also "involve no greater deprivation of liberty than is reasonably necessary to achieve those goals" and be

consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to § 994(a). *United States v. Napulou*, 593 F.3d 1041, 1044 (9th Cir. 2010); 18 U.S.C. § 3583(d)(2), (3). Conditions "should relate to the nature and circumstances of the defendant's offense and to the defendant's history and personal characteristics." *United States v. Hohag*, 893 F.3d 1190, 1192 (9th Cir. 2018). Here, Probation proposes 23 special conditions of supervised release, some of which are objectionable. Understanding that it is a near certainty that Mr. Guardado will be deported at the end of his sentence, Mr. Guardado objects to the following proposed release conditions should he be permitted to remain in the United States:

**Conditions 7 & 9**. These conditions, relating to cell phone and computer usage, and accessing the Internet, are substantively unreasonable. While they are theoretically related to the goals of deterrence and protection of the public, they are overbroad and "infringe[] more on [Mr. Guardado's] liberty than is reasonably necessary to accomplish these statutory goals." *United States v. Evans*, 883 F.3d 1154, 1161 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 133 (2018) (citing *United States v. Wolf Child*, 699 F.3d 1082, 1090 (9th Cir. 2012) and 18 U.S.C. § 3583(d)(1), (2)) (internal quotations omitted). Taken together, the conditions bar Mr. Guardado from possessing or using any electronic device—including a computer or mobile phone—or accessing the internet for any purpose whatsoever without the prior approval of his probation officer. He cannot, for example, use a smartphone for non-internet related tasks, like placing a phone call or inputting events on a calendar. Similarly, he cannot access the internet in ways we have all come to rely on, such as looking up the bus schedule, applying for a job, using Google Maps, listening to music, or reading the news. *See United States v. LaCoste*, 821 F.3d 1187, 1191 (9th Cir. 2016) (recognizing the use of the internet "is vital for a wide range of routine activities in today's world"). "Cutting off all access to the Internet constrains a defendant's freedom in ways that make it difficult to participate fully in society and the economy." *Id.*

Because of the prevalence of the internet in today's society, "courts have upheld conditions prohibiting all use of the Internet only in limited circumstances." *Id.*; *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (explaining that the internet has become a quintessential forum for the exercise of First Amendment rights and striking down a statute prohibiting sex

offenders from using social media). Even in cases involving child pornography or sex-offender offenses, courts have struck bans on the internet or computers. *United States v. Ellis*, 984 F.3d 1092, 1104 (4th Cir. 2021) (involving defendant convicted of failure to register as a sex offender and holding condition banning internet access was impermissibly overbroad); *United States v. Holena*, 906 F.3d 288, 292 (3d Cir. 2018) (holding computer, communication-devices, and internet ban overbroad even though use of the internet was integral to the defendant's offense of using the internet to try to entice a child into having sex); *United States v. Crume*, 422 F.3d 728, 733 (8th Cir. 2005) (holding bar on computer and internet access greater deprivation of defendant's First Amendment rights than was reasonably necessary for defendant convicted of child pornography offense); *United States v. Holm*, 326 F.3d 872, 877–78 (7th Cir. 2003) (condition barring defendant internet access impermissible even where convicted of child pornography offense); *United States v. Freeman*, 316 F.3d 386, 391–92 (3d Cir. 2003) (condition forbidding defendant convicted of child pornography offense computer in home or using internet service without approval of probation officer overly broad); *United States v. Sofsky*, 287 F.3d 122, 126–27 (2d Cir. 2002) (same).

Although the challenged conditions allow for use of the internet or computer with the permission of a probation officer, allowing the defendant to obtain the approval of his probation officer does not save an overbroad restriction. *See, Freeman*, 316 F.3d at 391–92; *LaCoste*, 821 F.3d at 1192; *Wolf Child,* 699 F.3d at 1095–96 & n.4.

Mr. Guardado's conduct in this case included downloading a small number of child pornography images from the internet, but did not include any trading, sharing, or other indications of more sophisticated engagement with accessing child pornography on the internet. His offense conduct was technologically unsophisticated.

Further, the goals of the objectionable conditions can be accomplished through the other recommended conditions. Condition 8 requires Mr. Guardado to submit to the Computer and Internet Monitoring Program. Mr. Guardado has no objection. Condition 10 allows for unannounced examinations of computer equipment, including retrieval and copying of data, as well as mandated consent to installation of monitoring hardware and software. Condition 6 is an expanded, all encompassing, search condition of Mr. Guardado's person, residence, and devices to which he has

agreed. These conditions, in addition to the other supervision conditions, adequately address the goals of deterrence, protection of the public, and rehabilitation, without infringing on more liberty than necessary. "There is no need to cut off [Mr. Guardado's] access to email or benign internet usage when a more focused restriction, limited to pornography sites and images, can be enforced by unannounced inspection." *Freeman*, 316 F.3d at 392.

Should the Court choose to modify rather than reject these conditions, they should be narrowed. Proposed Condition 7, should only require preapproval for "possessing" or "owning" a computer, not "using" one. As to Condition 9, only certain internet sites or uses should be restricted, as already proscribed in Condition 14.

**Condition 11**. The Court should modify this condition to prohibit the "knowing" or "intentional" use of data encryption to avoid inspection by the probation office. Nearly all internet traffic utilizes some form of encryption, including everyday web access via HTTPS (HyperText Transport Protocol Secure). Virtually all financial transactions and many forms of simple commercial communications use data encryption, and this condition as presently worded would prohibit Mr. Guardado from engaging in routine and necessary online activities.

**Condition 15.** Mr. Guardado understands that his conviction included sexual contact, and restriction is therefore appropriate. Nonetheless, as presently worded this condition would potentially prevent him from exercising core associational freedoms, such as being in the company of family members or his friends' children. And, because he would be restricted from going within 100 feet of any location "where children are likely to gather," he would be barred from common spaces such as parks containing playgrounds, or sites throughout the Bay Area where families and tourists regularly gather. Such a broad condition is not reasonably related to the goals of deterrence and protection of the public in light of Mr. Guardado's specific circumstances and offense. Mr. Guardado proposes that the Court a modified condition that more narrowly tailors the burden on his liberty to any risk of future interactions with minors, such as:

> You shall not associate or have verbal, written, telephonic, or electronic communication with any person under the age of 18, except in the presence of, or with the permission of, the parent or legal guardian of said minor, unless otherwise approved by the probation officer. This provision does not encompass incidental contacts with persons under the age of 18 or contacts with persons under the age of

18, such as waiters, cashiers, ticket vendors, etc., with whom you must deal in order to obtain ordinary and usual commercial services.

Mr. Guardado believes that this is a reasonable accommodation of the parties' respective interests.

## V. Mr. Guardado has no ability to pay a fine or $5,000 special assessment

The Presentence Report recommends that the Court impose a $5,000 special assessment under the Justice for Victims of Trafficking Act of 2015 ("JVTA"), 18 U.S.C. § 3014(a). Under the JVTA, a "non-indigent person" convicted of possession of child pornography is subject to a $5,000 special assessment. The qualifier of "non-indigent person" distinguishes this special assessment from the general special assessment statute, 18 U.S.C. § 3013(a)(2)(A), which mandates a $100 special assessment on all defendants convicted of a felony regardless of whether they are indigent or not. Mr. Guardado is, in fact, indigent, and has been represented by appointed counsel in both the state proceeding in Contra Costa County as well as the instant case. The property in Oakland identified by the Presentence Report has not been owned by Mr. Guardado since it was sold in foreclosure, he is facing a minimum of 120 months in prison, and he has no other meaningful financial assets.

## CONCLUSION

Mr. Guardado takes full responsibility for his actions. He is deeply remorseful, and understands that no matter the Court's imposed sentence, he will be spending the rest of his life either in prison, in a country his family fled, or under supervision. Mr. Guardado asks that the Court accept the joint recommendation of the parties, and impose a sentence of 120 months, to be followed by a term of supervision at the Court's discretion.

Dated:    February 15, 2022                    Respectfully submitted,

                                               GEOFFREY HANSEN
                                               Acting Federal Public Defender
                                               Northern District of California

                                                       /S
                                               GRAHAM ARCHER
                                               Assistant Federal Public Defender